**TAUNAH et al. v. JONES, Collector of Internal Revenue.**

Civ. No. 4228.

United States District Court
W. D. Oklahoma.

March 21, 1950.

Houston E. Hill, Oklahoma City, Okl., Richard H. Godfrey, Oklahoma City, Okl., for plaintiffs.

Robert E. Shelton, United States Attorney, Oklahoma City, Okl., J. W. Hussey, Assistant Attorney General, Washington, D. C., for defendant.

CHANDLER, District Judge.

Now, on this 28th day of February, 1950, the Court, after considering the stipulation of facts, admissions of the parties,

the briefs and oral arguments, makes the following findings of fact:

## Findings of Fact

1. The Court has jurisdiction of the parties and of the subject matter.

2. The defendant, H. C. Jones, at all pertinent times herein was the duly commissioned, qualified and acting Collector of Internal Revenue of the United States for the State of Oklahoma.

3. Peawifeah (Flora Taunah), a plaintiff herein, is a fullblood restricted Comanche Indian, Allotment No. 1929, Individual Indian Account No. P–116. She owns certain restricted Indian land some of which was originally allotted to her and some of which she inherited. Title to this land is held in trust by the United States Government for the plaintiff, Peawifeah.

4. Bert Taunah (Wauk-We), the other plaintiff herein, and husband of Peawifeah, is a fullblood restricted Comanche Indian, Allotment No. 742, Individual Indian Account No. B–47. He owns certain restricted Indian land some of which was originally allotted to him and some of which he inherited. Title to this land is held in trust by the United States Government for the plaintiff, Bert Taunah.

5. This land is restricted Indian land, the original trust patents for which were issued to the allottees by the General Land Office under date of August 25, 1901. The trust period has been extended by Executive Order, as provided by law, and the extended trust period has not expired. The land was allotted to or inherited by the plaintiffs under the provisions of the General Allotment Act of 1887,[1] and the Jerome Agreement of 1892, ratified by Congress, June 6, 1900.[2]

6. During the year 1946, Peawifeah received $195.56, agricultural and interest income, and the sum of $25,239.99, oil and gas rentals and royalties, all except $22.46 of which came from her original allotment. A deduction for depletion of 27½%, or

$6,941.00 was taken on the royalty income, resulting in a determination of Peawifeah's taxable income for 1946 as $18,494.55.

7. During the year 1946, Bert Taunah received $345.00, agricultural lease income, $360.00 oil and gas royalty income, $100.00 oil lease bonus, and 40¢ interest (not in controversy), making a total income of $805.40. A deduction of $99.00 for percentage depletion on the bonus and royalty income resulted in a determination that Bert Taunah's taxable income was $706.40.

8. In 1946, Peawifeah and Bert Taunah received aggregate taxable income from all sources of $19,200.95, which amount was equally divided between them for income tax purposes. The resulting income tax collected totaled $3,950.42.

9. The Income Tax Return for the calendar year 1946 was prepared and filed for plaintiffs by a United States Government employee of the Southern Plains Agency, formerly the Western Oklahoma Consolidated Agency and the Kiowa Indian Agency, at Anadarko, Oklahoma. The tax payable under the return was deducted from plaintiffs' individual Indian accounts on deposit with the Treasurer of the United States and under the supervision and control of the Secretary of the Interior on January 31, 1947, and was credited to the account of defendant, United States Collector of Internal Revenue for the District of Oklahoma.

10. None of the income involved was paid directly to these plaintiffs, but all was paid into the Indian Agency at Anadarko, Oklahoma, and each disbursement therefrom was made under supervision and control of the Department of the Interior. All such restricted funds are held by the United States Government for the sole use and benefit of the individual Indian owner, and all receipts or expenditures for each Indian are credited or charged to his individual account.

11. All income involved in this controversy is derived directly from the land

1. Act Feb. 8, 1887, 24 Stat. 388, amended, Act Feb. 28, 1891, 26 Stat. 794, May 8, 1906, 34 Stat. 182, 25 U.S.C.A. §§ 331–334, 339, 341, 342, 348, 349, 381.

2. 31 Stat. 676, 678.

which was allotted or inherited under the provisions of the General Allotment Act of 1887 and the Jerome Agreement, supra.

### Conclusions of Law

■ 1. This Court has jurisdiction of this cause as it is one of the classes of cases provided for in 28 U.S.C.A. §§ 1340, 1353, 26 U.S.C.A. § 3772 having been complied with.

2. The land involved is held by the United States Government, in trust, for noncompetent fullblood Indian plaintiffs under the provisions of the General Allotment Act of 1887, supra, which provides that at the expiration of the trust period the land will be delivered to the allottee, or his heirs, in fee, discharged of the trust, and *"free of all charge or incumbrance whatsoever."* [3] 25 U.S.C.A. § 348. The Jerome Agreement of 1892, supra, ratified by Congress in 1900, which has specific application to the Comanche lands, provides that the allotted land shall be conveyed at the end of the trust period "to the allottees or their heirs, *free from all incumbrances."* [3] The patents issued pursuant to the above acts use the language, "at the expiration of said period the United States will convey * * * to said Indian, or her heirs * * * in fee, discharged of said trust and *free of all charge or incumbrance whatsoever."*[3]

The Supreme Court early held that freedom from incumbrance as used in the General Allotment Act of necessity meant freedom from taxation, because if the land "may be taxed, then the obligations which the government has assumed in reference to these Indians may be entirely defeated." U. S. v. Rickert, 1902, 188 U.S. 432, 438, 23 S.Ct. 478, 480, 47 L.Ed. 532.[4] See also, Morrow v. U. S., 8 Cir., 1917, 243 F. 854. Four years after the Rickert decision, Congress amended the General Allotment Act by adding a proviso, "that the Secretary of the Interior may * * * whenever he shall be satisfied that any Indian allottee is competent * * * cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or *taxation* of said land shall be removed * * *."[5] 25 U.S.C.A. § 349. This Act, and the subsequent legislation dealing with this type of Indian land, shows that Congress always regarded this land as tax exempt. Any doubt about this was dispelled when Congress provided that where the Secretary of Interior issued a patent without the consent of the allottee, prior to the normal expiration of the trust period, so that the land became prematurely subject to taxation, the Secretary of Interior was authorized to *reimburse* the allottee for taxes paid by the Indian on the land during the unexpired trust period. 25 U.S.C.A. § 352c. Congress further enacted legislation which expressly tolled the Statute of Limitations as to refund claims by Indians for taxes "erroneously or illegally" paid upon "rents, royalties, or other gains arising from * * * lands" which "by the terms of said treaty or agreement was exempted from taxation," or, "restricted against alienation." Act Jan. 29, 1942, 56 Stat. 22.

■ In view of the terms of the above Acts and their judicial and legislative construction, there can be no question that a tax exemption was created as to the land in controversy.

3. The tax exemption thus created by Congress runs equally against the State and Federal Governments. The exemption is not based upon the "federal instrumentality" doctrine, but simply upon the intent of Congress as expressed in its enactments pursuant to its plenary powers over the Indians. Cf., Oklahoma Tax Commission v. U. S., 1943, 319 U.S. 598, 63 S.Ct. 1284, 87 L.Ed. 1612; Superintendent of Five Civilized Tribes v. Commissioner, 1935, 295 U.S. 418, 55 S.Ct. 820, 79 L.Ed. 1517. The Congressional purpose was to relieve the Indian ward's land from the burdens

---

3. (Emphasis supplied.)

4. Though that part of the Rickert case which relies on the "federal instrumentality" doctrine has been repudiated, its construction of Congressional intent in the General Allotment Act is still valid.

5. (Emphasis supplied.)

462

of taxation. Taxation is equally burdensome whether imposed by a state or by the Federal Government. It is "immaterial as regards the point under discussion" whether the tax is imposed by a particular state or by the United States. Landman v. U. S., 1947, 71 F.Supp. 640, 109 Ct.Cl. 1, certiorari denied, 332 U.S. 815, 68 S.Ct. 153, 92 L.Ed. 392. Certainly this Court should not impute to the guardian the intent to preserve the ward's assets from invasions by third parties but not from invasions by the guardian himself.

■ 4. Neither the fact that plaintiffs were restricted Indian wards, nor the fact that their income was entirely received and controlled by the Secretary of the Interior, is sufficient, standing alone, to grant the plaintiffs tax immunity. Superintendent of Five Civilized Tribes v. Commissioner, supra. If the income here in question is not subject to Federal taxation, it is because of the Congressional intent that this allotted land should be free from all burdens. Oklahoma Tax Commission v. U. S., supra; Superintendent of Five Civilized Tribes v. Commissioner, supra; Choteau v. Burnet, 1931, 283 U.S. 691, 51 S.Ct. 598, 75 L.Ed. 1353. The Supreme Court has held that this kind of allotted land is exempt from ad valorem taxation, U. S. v. Rickert, supra; that the right to transfer similar allotted land at death is exempt from estate taxation, Oklahoma Tax Commission v. U. S., supra,[6] and that the royalty interest in similar allotted land is exempt from taxation on the gross value thereof, Carpenter v. Shaw, 1930, 280 U.S. 363, 50 S.Ct. 121, 74 L.Ed. 478. In the lower courts it has been held that the income from such land is exempt from Federal income taxation. U. S. v. Homeratha, D.C. 1930, 40 F.2d 305. See also, Pitman v. Commissioner, 10 Cir., 1933, 64 F.2d 740. Even though the Supreme Court has not yet decided this question, one cannot read the opinion in the Choteau case, supra, without being impressed with the care with which the Court distinguished the income from non-taxable homestead land from the income which was held to be taxable in that case. Nor can one ignore the care with which the Court pointed out that the income held to be taxable in Superintendent of Five Civilized Tribes v. Commissioner, supra, was not direct income from non-taxable land.

■ In the somewhat related case of People of State of New York ex rel. Cohn v. Graves, 1937, 300 U.S. 308, 57 S.Ct. 466, 468, 81 L.Ed. 666, 108 A.L.R. 721, it was held that the Fourteenth Amendment did not prevent one state from taxing the income of its citizens derived from land in another state because "income is not *necessarily* clothed with the tax immunity enjoyed by its source." [7] In the instant case the income is clothed with the immunity of its source because Congress intended to protect all attributes of ownership in this allotted land from the burdens of taxation, including the rents and royalties therefrom. In the Graves case, supra, the question was whether the state had the Constitutional power to tax its citizens' income from land outside the state; here, the question is whether Congress has, by its own enactments, denied itself the right to exercise its power to tax the income from this Indian land. The questions are totally different in nature. The solemn obligations of the United States embodied in this tax exemption would be repudiated if it were held that the exemption covers the relatively less burdensome ad valorem and excise taxes, but not the more burdensome income taxes on the yield from the land. Qualitatively, the impact in either case is the same since the usefulness of the land to the Indian ward depends on the net yield to him after payment of all taxes imposed upon him as a result of his ownership of the land. Moreover, though royalty income is generally deemed income for Federal income tax purposes, the royalties nonetheless

6. See also, Landman v. U. S., supra. Contra, Landman v. Commissioner, 10 Cir., 1941, 123 F.2d 787, certiorari denied, 315 U.S. 810, 62 S.Ct. 799, 86 L.Ed. 1209.

7. (Emphasis supplied.)

are *corpus* as a matter of general property law and hence it must follow that to tax *this* royalty is to tax the tax exempt land itself. Cf., Parker v. Riley, 1919, 250 U.S. 66, 70, 39 S.Ct. 405, 63 L.Ed. 847.

It must not be forgotten that these Indians were not granted this tax exemption gratuitously. It was granted as a result of a somewhat coercive bargaining transaction whereby the Indians gave up their nomadic life and their vast communal lands and property in exchange for limited tracts of land to be held in trust for them by the United States. 7 Stat. 474, 14 Stat. 717, 15 Stat. 581, 31 Stat. 676. For this reason the Supreme Court has stated with respect to such agreements conferring tax exemptions that "doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith." Carpenter v. Shaw, supra [280 U. S. 363, 50 S.Ct. 122]. This is not a question of conferring a tax exemption by implication, but instead, a question of delimiting the proper scope of a tax exemption the existence of which has long been decisively determined. U. S. v. Rickert, supra.

It is concluded that, as a result of the above discussed Congressional enactments, the direct income from this allotted land is exempt from Federal income taxation.

5. This tax exemption, once granted by Congress, is a vested property right which cannot constitutionally be impaired by subsequent legislation. Choate v. Trapp, 1912, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941. Therefore, insofar as the broad statutory concept of income as used in the Internal Revenue Code, I.R.C. § 22(a), 26 U.S.C.A. § 22(a), is repugnant to this tax exemption, it is void.

6. The tax was erroneously, wrongfully, and illegally collected and received by the defendant.

7. Plaintiffs are entitled to recover $3,950.42 with interest at 6% from January 31, 1947, together with costs of this action.